**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

CASE NO. ____________________

JOHN JAMES SIMONE,

Plaintiff,

v.

SERVIS ONE, INC. d/b/a
BSI FINANCIAL SERVICES,

Defendant.
________________________________________/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff John James Simone ("Mr. Simone") sues Defendant Servis One, Inc. d/b/a BSI Financial Services ("BSI") for violations of (1) the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605, and its implementing regulation, Regulation X, 12 C.F.R. §§ 1024.35 and 1024.36; and (2) the Florida Consumer Collection Practices Act ("FCCPA"), Fla. Stat. § 559.72(9).

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 12 U.S.C. § 2614 because this case arises under RESPA.

2. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a). They arise from the same loan account, the same fees and charges, and the same statements and letters as the RESPA claims.

3. Venue lies in this District under 28 U.S.C. § 1391(b)(2) and 12 U.S.C.

§ 2614. The mortgaged home is in Lee County, Florida, and BSI sent the statements and letters at issue to Mr. Simone and his counsel in Florida.

4. This Court has personal jurisdiction over BSI because BSI services a mortgage loan on a Florida home, sends statements to the Florida borrower, and collects his payments, and these claims arise from that servicing.

5. All conditions precedent to this action have occurred, or Mr. Simone has performed them, or BSI has waived them.

## PARTIES

6. Mr. Simone is a natural person who lives at 9793 Carolina Street, Bonita Springs, Lee County, Florida 34135.

7. Servis One, Inc. is a corporation that does business as BSI Financial Services, with offices at 314 S. Franklin Street, Titusville, Pennsylvania 16354, and 4200 Regent Boulevard, Irving, Texas 75063.

## FACTUAL ALLEGATIONS

**Mr. Simone's home secures an FHA-insured loan.**

8. Mr. Simone's home secures a $153,133.00 note and a mortgage, both dated July 26, 2021 (the "Mortgage").

9. The Federal Housing Administration ("FHA") of the Department of Housing and Urban Development ("HUD") insures the Mortgage.

10. In 2025, Mr. Simone's monthly payment was $1,369.79: $645.61 for principal and interest and $724.18 for escrow.

11. Mr. Simone lives in the home that secures the Mortgage, and BSI is the

servicer.

**The Mortgage limits the fees BSI may charge.**

12. Section 13 of the Mortgage provides: "Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees."

13. Section 13 continues: "Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law."

14. The Mortgage defines "Applicable Law" to include "all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law)."

15. Section 15 provides: "All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law."

16. Section 9 makes "[a]ny amounts disbursed by Lender under this Section 9" additional debt secured by the Mortgage.

17. Sometime in 2024, the Mortgage fell into default.

18. The last installment Mr. Simone paid before his 2024 default was the February 2024 installment, which BSI posted on March 16, 2024.

19. From April through August 2024, BSI's vendor, Safeguard Properties ("Safeguard"), inspected the home each month, and every report said "Occupied."

20. On August 14, 2024, BSI referred the Mortgage to the law firm Kelley

Kronenberg for a judicial foreclosure.

21. A week later, Kelley Kronenberg invoiced BSI $1,900.00 for "Attorney Fees - Foreclosure Through Searches," with the note "TITLE MILESTONE."

22. The same invoice included a $350.00 "Title Costs - Title Search" charge that Vylla Title, LLC had billed to Kelley Kronenberg on August 20, 2024.

23. The invoice describes no attorney task or work beyond its fee line.

24. The invoice lists "First Legal Action: N/A."

25. BSI says it paid that invoice with an August 26, 2024 check to Kelley Kronenberg, P.A. for $23,717.24, which BSI described as "a bulk check for multiple payments for several accounts."

26. BSI explained that the $1,900.00 "represents the Title Milestone" and "is billed once the attorney completes the title review which can take up to 8 hours to review."

27. BSI has produced no record of any attorney work behind that invoice.

28. No foreclosure action was ever filed against Mr. Simone.

29. On August 26, 2024, BSI billed the $1,900.00 and the $350.00 to Mr. Simone's loan account.

**BSI approved a partial claim, and Mr. Simone signed it.**

30. BSI approved Mr. Simone for what it called "a Standalone Partial Claim in the amount of $14,144.50."

31. On September 30, 2024, BSI sent Mr. Simone a promissory note payable to the Secretary of HUD for $14,144.50, a partial claim mortgage securing it, and an

"Errors and Omissions/Compliance Agreement," each dated September 27, 2024 ("Partial Claim 1").

32. BSI later broke down the $14,144.50: a "Delinquent Payment Amount" of $5,164.88, an "Escrow Advance" of $6,579.62, and a "Capitalized Fee" of $2,400.

33. The $5,164.88 is exactly eight months of principal-and-interest payments.

34. On information and belief, the $2,400 Capitalized Fee was the $2,250.00 Kelley Kronenberg invoice plus the five $30.00 inspection fees BSI had billed by September 11, 2024.

35. On information and belief, Partial Claim 1 was a COVID-19 Recovery Standalone Partial Claim, which HUD kept available through April 30, 2025.

36. On October 3, 2024, Entra Title LLC invoiced BSI $148.14 as a "Partial Claim Recording Fee," which was not billed to Mr. Simone's loan account.

37. On October 7, 2024, Mr. Simone signed Partial Claim 1, acknowledged the mortgage before a notary in Lee County, and returned the documents to BSI who recorded it.

38. Three days later, BSI posted an $18,019.71 receipt to his loan account.

39. The same day, BSI reversed it.

**BSI withdrew Partial Claim 1, saying it had left out the foreclosure fees.**

40. BSI later explained: "Subsequent to you returning the signed documents to BSI, it was determined that the original decision for the Partial Claim did not include outstanding foreclosure fees and costs which were eligible to be included in the loss mitigation workout."

41. BSI continued: "Therefore, in December of 2024, we submitted an updated approval to FHA which included the outstanding fees and costs, and a new set of documents were sent to you for execution in January."

42. BSI added: "If the documents had not been redrawn, your loan would have a balance of foreclosure fees and costs due."

43. The new documents were a promissory note to HUD for $15,545.08 and a partial claim mortgage, each dated January 17, 2025, and a new Errors and Omissions/Compliance Agreement ("Partial Claim 2").

44. Partial Claim 2's redrawn note was $1,400.58 more than the note Mr. Simone had signed in October.

45. To save his home, Mr. Simone signed Partial Claim 2 before a notary in Lee County on February 3, 2025.

46. The Errors and Omissions/Compliance Agreement for both partial claims concerns clerical errors "to enable Lender to sell, convey, seek guaranty or market the Loan."

47. BSI did not attribute the redraw to a clerical error but to "the original decision for the Partial Claim."

48. The $18,019.71 receipt matches neither partial claim note.

49. It exceeds Partial Claim 1 by $3,875.21 and Partial Claim 2 by $2,474.63, and BSI first posted the same amount on October 10, 2024, before the redraw.

50. Nothing BSI has produced explains what the $18,019.71 was or who funded it.

**BSI's own numbers show Partial Claim 1 already carried $2,400 in fees.**

51. BSI broke down $15,545.08 in Partial Claim 2: a "Delinquent Payment Amount" of $6,456.10, an "Escrow Advance" of $7,765.92, a "Capitalized Fee" of $2,430.00, and a credit of $1,106.94 in "Suspense/Unapplied funds."

52. Partial Claim 1, which BSI said "did not include outstanding foreclosure fees and costs," already carried $2,400 in capitalized fees, including the Kelley Kronenberg fees and costs.

53. The only fee BSI added to Partial Claim 2 was the $30.00 inspection fee it billed on December 23, 2024.

54. The rest of the $1,400.58 came from two more months of principal and interest, $1,291.22, and $1,186.30 more in escrow advances, less $1,106.94 of Mr. Simone's payments that BSI held in suspense.

55. Partial Claim 2's $6,456.10 is exactly ten months of principal-and-interest payments.

56. BSI confirmed that "the $1,400.58 difference between the $14,144.50 [Partial Claim 1] balance and the $15,545.08 [Partial Claim 2] balance is provided in the breakdowns."

57. BSI submitted the updated approval in December 2024, after Mr. Simone had resumed his monthly payments in November 2024.

58. Neither breakdown lists a late charge.

**A complaint to the CFPB reached BSI, and BSI set a first payment date.**

59. On February 10, 2025, Mr. Simone submitted a complaint to the

Consumer Financial Protection Bureau ("CFPB"), which the CFPB forwarded to BSI.

60. The complaint stated: "January we were sent a whole new agreement with over $1000 in fees added with no explanation. None of the payments show on monthly statements and our agreement was not honored."

61. On February 26, 2025, BSI answered: "At this time, we are processing the system changes for the most recent Partial Claim in the amount of $15,545.08. The first payment date is March 1, 2025."

**BSI held Mr. Simone's payments, applied them to 2024 installments, and charged late fees.**

62. Mr. Simone paid BSI $1,369.79 on November 5, 2024; $1,369.79 on December 11, 2024; $1,369 on January 15, 2025; $1,362 on February 14, 2025; and $1,369.79 on March 13, 2025.

63. BSI placed each payment in "UNAPPLIED FUNDS" instead of applying it to principal, interest, and escrow.

64. Then, between January 3 and March 14, 2025, BSI applied the unapplied funds to the installments due March 1, April 1, May 1, and June 1, 2024, at the 2024 payment amount of $1,500.82.

65. BSI assessed a $25.82 late charge with each of the four applications, on January 3, January 16, February 25, and March 14, 2025.

66. BSI paid itself the February 25 charge out of the unapplied funds.

67. BSI had also assessed $25.82 late charges on February 6 and March 16, 2024, for the January and February 2024 installments.

68. On January 17, 2025, BSI moved $1,106.94 of the held funds to "UNAPPLIED FUNDS TO 4."

**BSI kept billing default fees while the partial claim sat unbooked due to BSI's error.**

69. BSI billed Mr. Simone's account $30.00 for each of six inspections, on May 7, May 28, June 24, July 29, September 11, and December 23, 2024.

70. The December inspection came after Mr. Simone had signed the partial claim and resumed his monthly payments in November 2024.

71. On January 21, 2025, BSI waived one $30.00 fee.

72. On February 21, 2025, Entra invoiced BSI $126.74 as a "Partial Claim Recording Fee."

73. On February 25, 2025, BSI billed the $126.74 to Mr. Simone's account, labeled "CURATIVE TITLE," and attempted to collect it in Mr. Simone's March statement.

74. On information and belief, the $126.74 paid to record Partial Claim 2.

**BSI's March 14, 2025 statement demanded $16,770.72.**

75. BSI's monthly mortgage statement dated March 14, 2025, reported "Date of Default: 07/01/2024" and stated: "As of 03/14/25 you are 256 days delinquent on your mortgage loan."

76. The statement demanded $16,770.72, including $2,810.76 in "Total Fees and Other Charges."

77. It warned: "Failure to bring your loan current may result in fees and

foreclosure - the loss of your home."

78. BSI sent that statement sixteen days after it told the CFPB that Mr. Simone's "first payment date is March 1, 2025," and after he had signed Partial Claim 2.

**On April 10, 2025, BSI booked the claim and paid itself from the same posting.**

79. On April 10, 2025, BSI posted the $18,019.71 receipt again.

80. BSI applied the receipt, plus $811.27 of Mr. Simone's own payments it still held, to eleven installments, July 2024 through May 2025, totaling $15,329.75.

81. From the same posting, BSI collected $2,526.74 in fees: the $1,900.00 and $350.00 billed for Kelley Kronenberg, the $126.74 recording fee, and five $30.00 inspection fees.

82. BSI also collected $129.10 in late charges, five charges of $25.82 each.

83. On information and belief, the $2,250.00 billed on Kelley Kronenberg's invoice and the inspection fees BSI collected from that posting were the same charges it had already capitalized into the partial claim.

84. Neither breakdown lists the $126.74 recording fee.

85. BSI applied the remaining $845.39 to principal as a "CURTAILMENT."

86. BSI later wrote that "the loan was brought current on April 10, 2025."

87. April 10, 2025, was 185 days after Mr. Simone signed Partial Claim 1.

88. BSI has not refunded any of the fees or late charges it collected.

**The money BSI took was money not applied to Mr. Simone's account.**

89. Every dollar BSI took for fees and late charges from the April 10 posting

was a dollar it did not apply to Mr. Simone's principal, where the remaining $845.39 went.

90. That posting included $811.27 of Mr. Simone's own payments, and the February 25, 2025 late charge came from his payments alone.

91. Mr. Simone's $15,545.08 debt to HUD, secured by a subordinate mortgage on his home, includes the $2,430 in capitalized fees and the $1,400.58 BSI added in the redraw.

**Mr. Simone, through counsel, asked BSI to correct the account and explain it.**

92. On May 22, 2025, Loan Lawyers, LLC ("Loan Lawyers"), on behalf of Mr. Simone, sent BSI a notice of error and request for information to the address BSI designated for notices of error and requests for information. The letter identified Mr. Simone by name, his account number, and the property address.

93. The letter told BSI that the loan still showed a July 1, 2024, default and continued to incur fees. It asked for a list of all fees, the invoices behind them, and why the loan still showed a default.

94. BSI received the letter on May 27, 2025, and responded on June 3, 2025.

95. BSI wrote that it "has previously responded to similar requests regarding this matter" and that "[a]s of the date of this letter, there are no fees due."

**BSI answered the November 21, 2025, request a day late, without proof of payment.**

96. On November 21, 2025, Loan Lawyers sent BSI a request for information at its designated address, identifying Mr. Simone by name, his account number, and

the property address.

97. The request asked for breakdowns of the $14,144.50 and $15,545.08 partial claim amounts, the original invoices for the $1,400.58 BSI added, and evidence of payment of the inspection invoices and of any Kelley Kronenberg invoices.

98. BSI received the request on November 26, 2025.

99. By letter dated January 9, 2026, BSI wrote: "We are currently researching this. We will be providing a more detailed response within the next 15 business days as provided by law."

100. Forty-five days after November 26, 2025, ended on February 3, 2026.

101. On February 5, 2026, Loan Lawyers sent BSI by certified mail a notice and opportunity to cure letter stating that BSI's response was overdue and giving it ten more days. Mr. Simone paid the postage.

102. BSI dated its response February 4, 2026, one day after the forty-five days ended.

103. It gave the two breakdowns, enclosed vendor invoices and a transaction history, and stated that the $1,400.58 difference "is provided in the breakdowns."

104. Asked for evidence of payment of any invoices for legal fees and costs, including Kelley Kronenberg's, BSI wrote "please see the enclosed paid invoices."

105. The enclosed Kelley Kronenberg invoice is a printout made the day BSI requested the check, and its status reads "Check Requested."

106. Asked for evidence that BSI paid the inspection invoices, BSI referred to "the enclosed invoices and the payment history."

107. Each enclosed Safeguard invoice is likewise a printout from its check-requested date with a "Check Requested" status, and two carry the exception "Possible Duplicate Invoice."

108. On February 17, 2026, BSI answered the February 5 letter by re-sending the February 4 response, writing that "BSI's records indicate that we sent a response letter on February 4, 2026."

109. BSI first produced a check to Kelley Kronenberg with its October 1, 2026, letter, after counsel asked again.

110. BSI has never produced a canceled check, wire confirmation, or disbursement record for the Safeguard inspection invoices, and it has never stated that such a record is unavailable.

**BSI answered the July 31, 2026, requests but not the notice of error.**

111. On July 31, 2026, Loan Lawyers sent BSI, at the address BSI designated, a notice of error and request for information that identified Mr. Simone by name, his account number, and the property address.

112. The notice asserted that adding $1,400.58 to the partial claim was "the imposition of a fee or charge that BSI lacks a reasonable basis to impose upon the Borrower."

113. It asserted as servicing errors "BSI's failure to timely and fully reinstate the loan, its imposition and collection of default-related fees and late charges after the Partial Claim was recorded, and its continued treatment of the loan as delinquent."

114. The notice identified the "$126.74 curative title recording charge," the

late charges, the continued property inspections and title work, and the statements reporting a July 1, 2024 default and demanding $16,770.72.

115. The notice asserted errors that the May 22, 2025 letter had not raised, including the $1,400.58 added to the partial claim, the $126.74 recording charge, and the late charges.

116. The letter requested seven items, including the invoices behind the $1,400.58, evidence of payment of Kelley Kronenberg Invoice No. 99579, and the basis for each fee BSI collected on April 10, 2025.

117. It also requested BSI's reconciliation of the $18,019.71, the documents BSI submitted to HUD, and the foreclosure action, if any, for which BSI charged Kelley Kronenberg's fees.

118. BSI received the letter on August 5, 2026.

119. By letter dated October 1, 2026, BSI responded.

120. The letter did not state that BSI had corrected any error or that no error occurred.

121. It gave no reasons and did not tell Mr. Simone that he could request the documents BSI relied on.

122. It stated that "the loan is current," that "[t]he late charge balance is $0.00," and that "[t]he fee balance is $0.00."

123. Asked for the documents BSI submitted to HUD in support of the partial claim, BSI restated the item as a request for "copies of the partial claim documents." It enclosed only the redrawn note, mortgage, and agreement.

124. Asked for its reconciliation of the $18,019.71, BSI enclosed Partial Claim 2 and the fee invoices but no reconciliation.

125. Asked for the basis of each fee collected on April 10, 2025, BSI wrote only “please see the enclosed invoices.”

126. Asked to identify the foreclosure action for which BSI charged the Kelley Kronenberg fees, or the work actually performed to support each fee and cost, BSI named neither. It described only what the $1,900.00 “represents” and when it “is billed.”

127. It said nothing about the $350.00 title search.

128. BSI did not state that any requested information was unavailable.

129. BSI has never told Mr. Simone or Loan Lawyers that the November 21, 2025 request or the July 31, 2026 notice and request was duplicative, overbroad, or untimely.

**What BSI’s conduct cost Mr. Simone.**

130. BSI took from Mr. Simone’s account $2,250.00 billed on Kelley Kronenberg’s invoice, $126.74 for a partial claim recording fee, $150.00 for inspections, and $154.92 in late charges.

131. Mr. Simone owes HUD $15,545.08 under the redrawn note instead of the $14,144.50 under the note he signed first.

132. For 185 days after he signed Partial Claim 1, BSI treated Mr. Simone’s loan as in default while he made his monthly payments.

133. Mr. Simone still does not know what the $18,019.71 receipt was, whether

HUD paid BSI the capitalized fees, or what BSI submitted to HUD.

**COUNT I VIOLATION OF RESPA AND REGULATION X**
**12 U.S.C. § 2605(e), (k); 12 C.F.R. § 1024.35**

134. Mr. Simone's loan is secured by a lien on his home and is insured by FHA, so it is a "federally related mortgage loan" under 12 U.S.C. § 2602(1)(A) and (B)(ii).

135. BSI receives Mr. Simone's scheduled periodic payments and makes the escrow payments due from them, so BSI is a "servicer" under 12 U.S.C. § 2605(i)(2) and (3).

136. Loan Lawyers sent BSI the notices of error as Mr. Simone's agent.

137. The notices of error gave Mr. Simone's name, identified his account, and stated the errors he believed had occurred, so each was a notice of error under 12 C.F.R. § 1024.35(a).

138. Loan Lawyers mailed the notices of error to the address BSI designated for notices of error.

139. The notices asserted multiple servicing errors, including the "[i]mposition of a fee or charge that the servicer lacks a reasonable basis to impose upon the borrower," a covered error under 12 C.F.R. § 1024.35(b)(5).

140. BSI's failure to reinstate the loan when Mr. Simone signed the partial claim, and its continued treatment of the loan as delinquent, are also covered errors under 12 C.F.R. § 1024.35(b)(11).

141. When BSI later redrew the claim, it added two more months of principal

and interest, $1,291.22, and $1,186.30 more in escrow advances to his HUD debt.

142. Within thirty days, excluding legal public holidays, Saturdays, and Sundays, a servicer must either correct the error and notify the borrower or reasonably investigate and notify the borrower in writing that no error occurred. That notice must give the servicer's reasons and tell the borrower of his right to request the documents the servicer relied on. 12 C.F.R. § 1024.35(e)(1)(i), (e)(3)(i)(C); 12 U.S.C. § 2605(e)(2).

143. BSI neither corrected the errors nor reasonably investigated them.

144. Its October 1, 2026, response letter corrected no asserted error, did not state that no error occurred, gave no reasons, and did not tell Mr. Simone of his right to request the documents BSI relied on.

145. The notice of error asserted errors not substantially the same as any asserted earlier. BSI never sent the written notice that 12 C.F.R. § 1024.35(g)(2) requires before a servicer may treat a notice as duplicative, overbroad, or untimely.

146. BSI did not reasonably investigate.

147. A reasonable investigation of BSI's own records would have shown that Partial Claim 1 already carried $2,400 in capitalized fees, that the redraw added two more months of principal and interest after Mr. Simone resumed paying, and that BSI collected late charges, a recording fee, and inspection fees it had no basis to charge. It would have led BSI to correct them.

148. Because BSI did not investigate or correct, Mr. Simone lost money: $2,526.74 in fees and $154.92 in late charges taken from his account, and he still owes HUD the $1,400.58 the redraw added.

149. He also paid postage to send the July 31, 2026, notice of error, a letter he would not have needed had BSI investigated and corrected the errors raised on May 22, 2025.

150. BSI's conduct also cost Mr. Simone time. He read statements and letters reporting a default he had cured, gathered his records, and worked with counsel for more than a year to get BSI to explain and correct its own account.

151. It also caused him emotional distress. BSI reported him in default for months, demanded $16,770.72 to cure a default he had already cured, warned him that he could lose his home, and took fees it has never explained. He suffered stress, anxiety, and fear for his home.

152. BSI's answer to this notice repeated a pattern. Its June 3, 2025 response to the May 22, 2025 notice of error also did not state whether any error occurred. BSI sent the same form extension letter in January and September 2026, and it answered the November 2025 request late.

153. BSI is liable to Mr. Simone for actual damages under 12 U.S.C. § 2605(f)(1)(A), additional damages for a pattern or practice of noncompliance under 12 U.S.C. § 2605(f)(1)(B), and costs and a reasonable attorney's fee under 12 U.S.C. § 2605(f)(3).

**COUNT II VIOLATION OF RESPA AND REGULATION X**
**<u>12 U.S.C. § 2605(e), (k); 12 C.F.R. § 1024.36</u>**

154. Mr. Simone's loan is a "federally related mortgage loan" under 12 U.S.C. § 2602(1)(A) and (B)(ii), and BSI is its "servicer" under 12 U.S.C. § 2605(i)(2).

155. Loan Lawyers sent the November 21, 2025, and July 31, 2026, requests as Mr. Simone's agent.

156. Each request gave Mr. Simone's name, identified his account, and stated the information requested, so each was a request for information under 12 C.F.R. § 1024.36(a).

157. Loan Lawyers sent both requests to the address BSI designated for requests for information.

158. A servicer must acknowledge a request for information in writing within five days, excluding legal public holidays, Saturdays, and Sundays. 12 C.F.R. § 1024.36(c); 12 U.S.C. § 2605(e)(1)(A).

159. Within thirty days, excluding legal public holidays, Saturdays, and Sundays, a servicer must provide the information requested or, after a reasonable search, state in writing that it is not available and why. 12 C.F.R. § 1024.36(d)(1), (d)(2)(i)(B); 12 U.S.C. § 2605(e)(2)(C).

160. The servicer may take fifteen more days only if, before the thirty days end, it notifies the borrower in writing of the extension and the reasons for it. 12 C.F.R. § 1024.36(d)(2)(ii); 12 U.S.C. § 2605(e)(4).

161. BSI received the request on November 26, 2025. Its thirty days ended January 12, 2026, and even with an extension its time ended February 3, 2026.

162. BSI dated its response February 4, 2026, one day after its time ended.

163. It enclosed invoice printouts showing a "Check Requested" status but no canceled check, wire confirmation, or disbursement record for Kelley Kronenberg or

the inspection invoices, and it did not state that such evidence was unavailable.

164. On this request, BSI failed to comply with 12 C.F.R. § 1024.36(d) and 12 U.S.C. § 2605(e)(2), and so violated 12 U.S.C. § 2605(k)(1)(E).

165. The evidence BSI withheld concerned the Kelley Kronenberg and inspection fees BSI collected from Mr. Simone's account and, on information and belief, capitalized into his HUD debt.

166. BSI did not produce a check to Kelley Kronenberg until October 1, 2026, after Mr. Simone had to ask again, and it still has produced no disbursement record for the inspection invoices.

167. BSI's late and incomplete answer cost Mr. Simone postage twice. He paid to send the February 5, 2026 notice and opportunity to cure letter by certified mail, and to send the July 31, 2026 request, which repeated the request for proof of payment BSI had not answered.

168. BSI received the request on August 5, 2026. Mr. Simone and his counsel received nothing in writing from BSI until September 10, 2026, and BSI answered on October 1, 2026.

169. BSI's answer omitted the documents it submitted to HUD and any reconciliation of the $18,019.71. It gave no basis for the April 10 fees beyond "see the enclosed invoices," and it identified no foreclosure action and no work actually performed on this loan behind the Kelley Kronenberg charges. It did not state that any of that information was unavailable.

170. Item 2 repeats item 8 of the November 21, 2025 request, which BSI had

answered with invoice printouts and no record of payment, so BSI had not "previously complied with its obligation to respond." BSI also never sent the written notice 12 C.F.R. § 1024.36(f)(2) requires to invoke an exemption.

171. On this request, BSI failed to comply with 12 C.F.R. § 1024.36(c) and (d) and 12 U.S.C. § 2605(e)(1)(A) and (e)(2), and so violated 12 U.S.C. § 2605(k)(1)(E).

172. The information BSI withheld goes to whether HUD paid BSI the $2,430.00 in fees it capitalized into Mr. Simone's HUD debt, and whether BSI then collected the same fees again on April 10, 2025. It also goes to what the $18,019.71 receipt was.

173. Without it, Mr. Simone cannot determine whether BSI had any right to the $2,655.84 it took from his account on April 10, 2025, or recover it.

174. BSI's failures on both requests were part of a pattern: the same form extension letter, sent twice, and invoices offered in place of proof of payment and of the basis for its fees.

175. BSI is liable to Mr. Simone for actual damages under 12 U.S.C. § 2605(f)(1)(A), additional damages for a pattern or practice of noncompliance under 12 U.S.C. § 2605(f)(1)(B), and costs and a reasonable attorney's fee under 12 U.S.C. § 2605(f)(3).

## COUNT III VIOLATION OF THE FLORIDA CONSUMER COLLECTION PRACTICES ACT FLA. STAT. § 559.72(9)

176. Mr. Simone incurred his mortgage loan for personal, family, or household purposes, so his obligation on it is a "debt." Fla. Stat. § 559.55(6).

177. BSI is a "person" under Fla. Stat. § 559.72 because it tried to collect and did collect a debt from Mr. Simone.

178. BSI collected $1,900.00 for Kelley Kronenberg's "Foreclosure Through Searches" fee and $350.00 for the title search from Mr. Simone's account.

179. On February 26, 2025, BSI told Mr. Simone that "[i]f the documents had not been redrawn, your loan would have a balance of foreclosure fees and costs due."

180. On information and belief, Partial Claim 1's $2,400 in capitalized fees included the $2,250.00 on Kelley Kronenberg's invoice, so without the redraw no balance of those foreclosure fees would have been due.

181. HUD's regulation lets a mortgagee collect fees after endorsement "only as provided below," and "only to the extent that the mortgagee is not reimbursed for such fees by HUD." 24 C.F.R. § 203.552(a).

182. It allows attorney's fees "actually incurred ... when a case has been referred for foreclosure in accordance with the provisions of this part after a firm decision to foreclose."24 C.F.R. § 203.552(a)(9).

183. It requires that fees "be predicated upon the actual cost of the work performed including out-of-pocket expenses." 24 C.F.R. § 203.552(b).

184. The Mortgage allows default fees only "for services performed" and bars fees "expressly prohibited by ... Applicable Law," which includes HUD's regulations.

185. BSI never filed a foreclosure.

186. BSI has produced no time entry or work product from any attorney's review.

187. On information and belief, Kelley Kronenberg billed the $1,900.00 as a flat milestone charge, not one "predicated upon the actual cost of the work performed."

188. In the alternative, on information and belief, HUD reimbursed BSI for the Kelley Kronenberg charges through the partial claim, and BSI then collected them again from the April 10 posting.

189. BSI collected $2,250.00 it had no right to collect and asserted that without the redraw a balance of foreclosure fees would be due. In doing so, BSI attempted to enforce a debt it knew was not legitimate and asserted a legal right it knew did not exist, violating Fla. Stat. § 559.72(9).

190. BSI knew. It approved the invoice stating "First Legal Action: N/A," it knew it had filed nothing, it built the original claim that carried $2,400 in capitalized fees, and it collected the fees after the CFPB complaint.

191. Mr. Simone owes HUD the capitalized fees under a note secured by his home, and the April 10 posting from which BSI collected them included $811.27 of his own payments.

192. BSI also assessed and collected late charges it had no right to collect.

193. HUD requires the mortgagee to ensure that a COVID-19 Recovery Standalone Partial Claim "fully reinstates the Mortgage." It also provides that "Mortgagees must ensure that all Late Charges and penalties are waived," except those accumulated before March 1, 2020. HUD Mortgagee Letter 2023-03 (Handbook 4000.1 § III.A.2.o.iii(C)(1)(b)).

194. The partial claim was a COVID-19 Recovery Standalone Partial Claim, and every late charge BSI collected accrued in 2024 or 2025.

195. BSI collected each one after it approved the claim.

196. Independently, four of the charges, $103.28 in all, exist only because BSI did not book Partial Claim 1 after what it called an error in its "original decision."

197. BSI then held Mr. Simone's post-claim payments and applied them to March through June 2024 installments the claim should have cured.

198. Had BSI booked the claim in October 2024, it would have paid the 2024 arrears, and Mr. Simone's payments would have paid current installments with no late charge.

199. By assessing and collecting late charges the partial claim barred, BSI attempted to enforce a debt it knew was not legitimate and asserted a legal right it knew did not exist, violating Fla. Stat. § 559.72(9).

200. BSI knew. It chose, approved, and processed the claim while HUD barred the FHA-HAMP alternative, and it held the signed documents from October 2024. Before it took the March 14 and April 10 charges, it had received the CFPB complaint that "our agreement was not honored" and had set the claim's first payment date at March 1, 2025.

201. BSI left the late charges out of the partial claim and then took five of them in the same April 10, 2025, posting that booked it.

202. BSI took $154.92 in late charges, including $25.82 entirely from Mr. Simone's own payment.

203. BSI also billed Mr. Simone's account the $126.74 "Partial Claim Recording Fee" and collected it on April 10, 2025.

204. HUD's regulation allows post-endorsement fees "only as provided below." It covers charges for a "modification of the mortgage involving a recorded agreement for extension of term or reamortization," and its catch-all for other charges excludes "[c]harges for servicing activities of the mortgagee or servicer." 24 C.F.R. § 203.552(a), (a)(7), (a)(12)(i).

205. Neither partial claim mortgage extends the term of the Mortgage or reamortizes it. Each secures a separate note payable to HUD.

206. Recording a partial claim mortgage for a loss mitigation workout BSI arranged was a servicing activity of BSI.

207. To the extent the $126.74 recorded the redrawn mortgage, the Errors and Omissions/Compliance Agreement covers only "clerical errors," and BSI attributed the redraw to "the original decision for the Partial Claim."

208. The partial claim mortgage's only recording-cost term concerns its release: "Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs."

209. By charging and collecting the $126.74, BSI attempted to enforce a debt it knew was not legitimate and asserted a legal right it knew did not exist, violating Fla. Stat. § 559.72(9).

210. BSI knew. It arranged the workout and approved Entra's invoices, and it billed Mr. Simone the $126.74 but not the $148.14 or either $95.00 fee. It then blamed

the redraw on fees left out of a claim that, by its own breakdown, already carried $2,400 in fees.

211. Neither partial claim breakdown lists the $126.74. BSI took it from the April 10 posting, which included $811.27 of Mr. Simone's own payments, and did not apply it to his principal.

212. BSI billed Mr. Simone $30.00 for the December 11, 2024, inspection on December 23, 2024. On April 10, 2025, it collected five $30.00 inspection fees, including at least one for an inspection it ordered after July 17, 2024.

213. HUD requires a vacancy inspection "[w]hen a mortgage is in default and a payment thereon is not received within 45 days of the due date." The requirement also turns on whether "efforts to reach the mortgagor by telephone within that period have been unsuccessful." 24 C.F.R. § 203.377.

214. HUD's fee regulation allows "[p]roperty preservation expenses incurred pursuant to § 203.377," and its catch-all excludes "[c]harges for servicing activities of the mortgagee or servicer." 24 C.F.R. § 203.552(a)(14), (a)(12)(i).

215. Once Safeguard verified on July 17, 2024, by direct contact, that the owner occupied the home, a further inspection "to determine whether the property is vacant" had no basis under § 203.377.

216. By charging and collecting inspection fees it had no right to collect, BSI attempted to enforce a debt it knew was not legitimate and asserted a legal right it knew did not exist, violating Fla. Stat. § 559.72(9).

217. BSI knew because its own vendor told it, on July 17, 2024, that the owner

lived in the home. BSI then ordered a further inspection the day it referred the loan to foreclosure counsel, and another in December 2024, after Mr. Simone had signed the partial claim and resumed paying.

218. BSI took five inspection fees from the April 10 posting and did not apply that money to his principal. On information and belief, BSI also capitalized the same fees into Mr. Simone's HUD debt.

219. BSI also attempted to collect illegal debts.

220. Its March 14, 2025 statement demanded $16,770.72 to cure a 256-day delinquency and warned of foreclosure.

221. When BSI sent it, Mr. Simone had signed Partial Claim 2, and BSI had told the CFPB that the claim's "first payment date is March 1, 2025."

222. Under the claim as BSI itself described it, no installment due before March 1, 2025 remained for Mr. Simone to cure.

223. By demanding $16,770.72 to cure a default the partial claim had resolved, BSI attempted to enforce a debt it knew was not legitimate and asserted a legal right it knew did not exist, violating Fla. Stat. § 559.72(9).

224. BSI knew. Sixteen days earlier, its own CFPB response had set the claim's first payment date at March 1, 2025.

225. The statement told Mr. Simone that he was 256 days delinquent and could lose his home. See ¶¶ 73, 89–91.

226. BSI's illegal collection cost Mr. Simone money, and its months of statements reporting a default he had cured caused him emotional distress, including

stress, anxiety, and fear for his home.

227. BSI is liable to Mr. Simone for actual damages, additional statutory damages of up to $1,000, punitive damages, and costs and a reasonable attorney's fee under Fla. Stat. § 559.77(2).

## RELIEF REQUESTED

WHEREFORE, Mr. Simone asks the Court to enter judgment against BSI for:

a. Actual damages under 12 U.S.C. § 2605(f)(1)(A) and Fla. Stat. § 559.77(2);

b. Additional damages of up to $2,000 for a pattern or practice of noncompliance under 12 U.S.C. § 2605(f)(1)(B);

c. Statutory damages of up to $1,000 under Fla. Stat. § 559.77(2);

d. Punitive damages under Fla. Stat. § 559.77(2);

e. Costs and a reasonable attorney's fee under 12 U.S.C. § 2605(f)(3) and Fla. Stat. § 559.77(2); and

f. Such other relief as the Court finds just.

Mr. Simone demands a trial by jury on all issues so triable.

Dated: October ___, 2026,

Respectfully submitted,

*/s/ Darren R. Newhart*
Darren R. Newhart, Esq.
FL Bar No: 0115546
E-mail: darren@newhartlegal.com
NEWHART LEGAL, P.A.

14611 Southern Blvd, Suite 1351
Loxahatchee, FL 33470
Telephone: (561) 331-1806
Facsimile: (561) 473-2946

*/s/ [Loan Lawyers attorney]*
[LOAN LAWYERS ATTORNEY], Esq.
FL Bar No: [to be supplied]
E-mail: [to be supplied]
LOAN LAWYERS, LLC
3201 Griffin Road, Suite 100
Fort Lauderdale, FL 33312
Telephone: (954) 523-4357
Facsimile: (954) 337-2436
Counsel for Plaintiff